## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 21 2018, 9:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Jeffrey R. Wright
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Corey L. Walton,

*Appellant-Petitioner,*

v.

State of Indiana,

*Appellee-Respondent*

March 21, 2018

Court of Appeals Case No.
45A03-1709-PC-2111

Appeal from the Lake Superior Court

The Honorable Natalie Bokota, Magistrate

The Honorable Diane Ross Boswell, Judge

Trial Court Cause No.
45G03-1606-PC-0004

**Vaidik, Chief Judge.**

# Case Summary

Corey Walton appeals the denial of his petition for post-conviction relief challenging his convictions for attempted murder and attempted robbery. Finding no error, we affirm.

# Facts and Procedural History

One afternoon in July 2012, Henry Walker was at a park in Hammond when a man he didn't know approached him, pointed a gun at him, and demanded that he hand over everything he had. After a short struggle, the man shot Walker twice in the midsection and then fled. In a photographic lineup, Walker identified Walton as the shooter. The State charged Walton with attempted murder, attempted robbery, and battery.

While Walton was in jail awaiting trial, two of his friends went to the jail and spoke with him using the jail's videoconferencing system. Walton said, "I need you to do something for me" regarding "this f*** nig** who on my sh**." State's Trial Ex. 10 (file 17198501, starting at 12:04). He then held a document with Walker's name and address up to the camera. He continued:

> If this nig** show on a G, Cous', I go to trial, if I get found guilty, it's over with my nig**. They tryin' to hit me with like thirty, forty years. Cuz you know, I got attempt. Know what I'm sayin'? So, uh, I wanted you to go, know what I'm sayin', go see what's good and sh** man. I'm just gonna give you this little address and sh**. Go holler, know what I'm sayin'? . . . I mean G, cuz if these nig**s show it's over with, Cous'.

*Id*. Walton stated the street address and described its general location before adding:

> If the nig** don't show [inaudible] they gonna drop my case cuz they don't got, they never caught me with sh**, no burner,[1] nothing. Know what I'm sayin'? Those nig**s don't got sh** on me. They just got this, they just got nig**s telling on me. [Inaudible] and some f*** a** nig**, know what I'm sayin'? Hey, you blow in his ear.

*Id*. [2]

[4] At trial, Walker was the State's main witness, and when asked if the shooter was in the courtroom, he identified Walton. In addition, the State moved to have the video of the jail visit admitted into evidence. Walton's attorney objected on the ground that the video is "so absolutely inflammatory and that it's misunderstood, can be, and will likely be misunderstood. He says go holler. He's not saying go kill him. He's saying go holler at this guy." Trial Tr. p. 61. She added, "And my client's position is basically that why is this guy saying this, that I did this when it wasn't me." *Id*. The trial court overruled the objection and allowed the video to be played for the jury, finding it to be "relevant and probative." *Id*. at 62.

---

[1] "Burner" is slang for gun. *See* Trial Tr. p. 178.

[2] This is our transcription of the jail video. The State included a similar transcription in its brief, and Walton does not dispute its accuracy.

[5]     After all evidence was presented, the trial court gave each side ten minutes for closing argument. The prosecutor argued, among other things, that the video of the jail visit corroborated Walker's identification of Walton:

> [Y]ou have further information to corroborate that Mr. Walton is the perpetrator of this crime. You have a video that was played for you, and the video says certain things. You heard it and you saw Mr. Walton in that video. You saw Mr. Walton saying that it was the -- and I'm not going to use the term that he used, but it was the black guy. You heard Mr. Walton say that -- and hold up a piece of paper saying that he lived at an address on Nebraska Street. You heard the victim testify that he lived at an address on Nebraska Street. You heard Mr. Walton testify -- or not testify but say in the video that they never found a burner on him.
>
> You heard the defendant say in that video that they never found a burner, and you learned what the term burner meant on the streets. It means a gun. You heard the defendant say that he lives near that park. Well, you know that this crime occurred in a park. You have everything that you need to reach a verdict of guilty on each and every count in this case, and that's what I'm asking you to do. Thank you.

*Id*. at 220-21.

[6]     In her argument, Walton's attorney focused on the absence of various State witnesses, whether Walker was credible, and whether the photographic lineup was reliable. Regarding the jail video, she argued that the case "doesn't boil down" to "you saw a nasty video so it must have been him." *Id*. at 225. She added that the issue is not whether the jury "like[d] the defendant" but whether

the State had proven its case. *Id*. at 227. However, her time ran before she addressed the video any further, resulting in the following exchange:

COURT: Time, [counsel].

DEFENSE COUNSEL: I'm sorry?

COURT: Time.  Ten minutes up.

DEFENSE COUNSEL: I mean, up-up?

COURT: You can summary [sic].

DEFENSE COUNSEL: One quick?  Thank you.  The video, my client's an idiot.  My client's an idiot.  I'm not standing here telling you he's not a fool --

COURT: [Counsel], that's not a summary.

DEFENSE COUNSEL: I'm sorry?

COURT: That's not the -- that's not summing it up.

DEFENSE COUNSEL: Oh.

COURT: You're over time.  Go ahead.  Go ahead.

DEFENSE COUNSEL: Ladies and gentlemen, the bottom line, and I apologize, the burden has not been met and you should therefore find my client not guilty of all charges.  Thank you.

COURT: Thank you, [counsel].

*Id*. at 228.

[7] The jury found Walton guilty as charged. The trial court merged the battery count into the attempted-murder count and sentenced Walton to concurrent terms of thirty-five years for attempted murder and attempted robbery. Walton appealed his convictions, and we affirmed. *Walton v. State*, No. 45A03-1409-CR-320 (Ind. Ct. App. Apr. 24, 2015), *trans. denied*.

[8] In June 2016, Walton filed a petition for post-conviction relief. He initially included a number of claims but eventually withdrew all of them except one: that his trial attorney provided ineffective assistance by calling him "an idiot and a fool," tying this statement to "a video clip which the State had argued corroborated the victim's identification testimony," and "offering no contrary interpretation of the video clip th[a]n that advanced by the State of Indiana." Appellant's App. Vol. II p. 76. At the evidentiary hearing on the petition, Walton's trial attorney testified as follows about her strategy with regard to the jail video:

> My strategy for dealing with that, it was going to be a difficult task -- I remember that -- given what appeared on the video. I was basically going to say my client didn't have the sense to realize how what he was doing and saying on that video would appear to an outside person. I was just going to go with the strategy that what he was attempting to do was being misunderstood, that he had other intentions by what he was doing and saying in that video.

\*     \*     \*     \*

> He may be a dummy for doing this, but he meant no harm was what my strategy was going to be, in terms of how I was going to speak to the jury.

PCR Tr. pp. 21-23. When asked specifically why she referred to Walton as an "idiot" and a "fool," she explained, "I have to be honest, I have prevailed in the past by not trying to mislead a jury, by being frank with the jury. And my client, for doing what he did, how he did it, and presenting that impression, was idiotic and foolish." *Id*. at 37.

[9] After the hearing, the post-conviction court denied Walton's petition, concluding that calling Walton an idiot and a fool was part of a "reasonable trial strategy"—to "confront" the jail video, to be "frank" with the jury, and "to gain the juror's trust in her argument and to make the point that the defendant's video statements, while foolish, did not make him guilty of the underlying charges." Appellant's App. Vol. II pp. 119-20. The court also concluded that, even if the performance of Walton's attorney in this respect could be considered deficient, the evidence against Walton was "overwhelming," so there is not a reasonable probability that a better closing argument would have led to a different result. *Id*. at 120.

[10] Walton now appeals.

# Discussion and Decision

[11] A person who files a petition for post-conviction relief has the burden of establishing the grounds for relief by a preponderance of the evidence. *Hollowell v. State*, 19 N.E.3d 263, 268-69 (Ind. 2014). If the post-conviction court denies relief, and the petitioner appeals, the petitioner must show that the evidence leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id.* at 269.

[12] Walton contends that the post-conviction court should have granted him relief on the basis that his trial attorney rendered ineffective assistance. When evaluating such a claim, Indiana courts apply the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984): whether counsel performed deficiently and whether that deficient performance prejudiced the defendant. *Humphrey v. State*, 73 N.E.3d 677, 682 (Ind. 2017). An attorney's performance is deficient if it falls below an objective standard of reasonableness—if the attorney committed errors so serious that it cannot be said that the defendant had "counsel" as guaranteed by the Sixth Amendment. *Id.* A defendant has been prejudiced if there is a reasonable probability that the case would have turned out differently but for counsel's errors. *Id.*

[13] Regarding the deficient-performance prong, Walton argues that his trial attorney botched what we will call the "my client is an idiot but that doesn't make him a criminal" strategy with regard to the jail video. Specifically, Walton contends that his attorney executed part one of the strategy—calling

him "an idiot" and "a fool" for saying the things he said on the video, but then failed to execute part two—explaining why Walton's statements, while seemingly incriminating, do not make him guilty of the crimes charged. Walton acknowledges the trial court's role in cutting off the argument, but he asserts that his attorney could have finished part two if she had done one or more of the following: (1) moved more quickly throughout her entire closing argument; (2) asked the court for more time to finish the argument; or (3) continued with the argument after the court said "Go ahead. Go ahead." The State, on the other hand, argues that considering the defense argument as a whole, "it would have been apparent to the jury that trial counsel was stating that Walton was foolish for making the statements on the video but that those statements did not establish that Walton was the person that shot Walker." Appellee's Br. p. 10.

[14] While the manner in which Walton's attorney ended her argument certainly wasn't ideal, we are hesitant to say that her handling of the jail video amounted to deficient performance. Before things unraveled as time expired, Walton's attorney was able to convey to the jury the idea that the case "doesn't boil down" to the jail video, "nasty" though it was. She also reminded the jury that the issue was whether the State had proven its case, not whether the jury "like[d] the defendant." It would have been nice if she had wrapped up the argument at the end; that said, we're inclined to agree with the State that her ultimate message—"my client is an idiot but that doesn't make him a criminal"—was apparent to the jury.

[15] In any event, Walton has failed to convince us that there is a reasonable probability that a different closing argument would have led to a different result, and that alone is enough for us to affirm the denial of post-conviction relief. *See Baer v. State*, 942 N.E.2d 80, 91 (Ind. 2011) ("If we can easily dismiss an ineffective assistance claim based upon the prejudice prong, we may do so without addressing whether counsel's performance was deficient."), *reh'g denied*. Walton does not deny that the video looks very bad for him. Nonetheless, he insists that the verdict might have been different if his attorney had presented a contrary "interpretation" of the video. Appellant's Br. p. 27. He doesn't tell us what interpretation might have made a difference, but at trial, Walton's attorney said that Walton's position "is basically that why is this guy saying this, that I did this when it wasn't me." In other words, Walton apparently believed that the video should have been interpreted as an attempt by him to get his friends to pay a friendly visit to Walker to have a civilized conversation with him about how he had the wrong guy—not to kill, hurt, threaten, or otherwise intimidate him. Having reviewed the video, we believe it is **highly** unlikely that the jury would have accepted such an explanation. While Walton never specifically indicated that he wanted the visit to be hostile, the fact that he referred to Walker as a "f*** nig**" and a "f*** a** nig**" and told his friends to "blow in his ear" strongly suggests that Walton wasn't contemplating a pleasant encounter. Therefore, any attempt by Walton's attorney to put a positive spin on the video surely would have damaged—not bolstered—her credibility with the jury, and the post-conviction court did not err in concluding that counsel's failure to do so prejudiced Walton.

[16] Walton relies heavily on *Christian v. State*, 712 N.E.2d 4 (Ind. Ct. App. 1999). There, a defendant charged with rape testified that the sexual contact between him and his accuser was consensual and that, in any event, there was no penetration, which is an element of rape. During closing arguments, however, defense counsel conceded that penetration had occurred and instead argued only that it was consensual. We held that counsel's concession on the contested issue of penetration—which directly contradicted his client's own testimony—constituted ineffective assistance of counsel. *Id*. at 7.

[17] Walton asserts that his attorney made a concession that was "strikingly similar" to the one made in *Christian*. Appellant's Br. p. 24. We disagree. Unlike the attorney in *Christian*, Walton's trial attorney did not concede any element of a charged crime. The only thing she conceded was that Walton was an "idiot" and a "fool" for asking his friends, on a recorded video feed, to "holler" at Walker and "blow in his ear" in an effort to keep him from testifying against Walton. Since there is no dispute that this was an incredibly ill-advised thing for Walton to do, counsel's concession was nothing like the critical concession made in *Christian*.

[18] Affirmed.

May, J., and Altice, J., concur.